UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE AXOS BANK LITIGATION | Case No.: 23-cv-2266-RSH-SBC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION OR DISMISS**<br><br>[ECF No. 27] |

Before the Court is a motion to compel arbitration or to dismiss filed by defendant Axos Bank d/b/a UFB Direct ("UFB"). ECF No. 27. Pursuant to Local Civil Rule 7.1(d)(1), the Court finds the motion presented appropriate for resolution without oral argument. For the reasons below, the Court grants in part and denies in part UFB's motion.

**I.    BACKGROUND**

The instant case is a consolidated putative class action brought by customers holding savings accounts with UFB. It is one of several related cases pending in this District. *See Ash et al v. Axos Bank*, 24-cv-01157-RSH-SBC; *Pliszka v. Axos Bank,* 3:24-cv-00445-RSH-SBC.

The Consolidated Amended Complaint ("CAC") alleges Plaintiffs and other UFB customers were induced into opening savings accounts that UFB represented were the "highest yielding savings accounts we offer[.]" CAC, ECF No. 20 ¶ 2. UFB then executed a "bait and switch"—creating new accounts with slightly different names offering higher interest rates to new customers, without informing its existing accountholders. *Id.* ¶¶ 2, 46–66. Rather than increasing the interest rates earned on its earlier accounts, UFB reclassified them as "legacy accounts" and froze or decreased their Annual Percentage Yields ("APYs"). *Id.* ¶¶ 2, 53.

Named Plaintiffs Sutaniman, Kuperstein, and Blosser are residents of California, New Jersey and Arizona, respectively, who were affected by UFB's alleged misconduct. *Id.* ¶¶ 6–28. Plaintiffs seek to represent a class comprising: (1) "all persons who have been UFB high-yield savings accountholders since UFB first began offering high-yield savings account offered by UFB who did not, in fact, receive the highest APY offered by UFB"; and (2) subclasses comprising all persons in California, New York, and Arizona who similarly have been "UFB high-yield savings accountholders since UFB began offering the high-yield savings account product who did not, in fact, receive the highest APY offered by UFB." *Id.* ¶¶ 159–62.

The CAC brings claims for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraud; (4) violation of California's Unfair Competition Law; (5) violation of California's False Advertising Law; (6) violation of California's Consumer Legal Remedies Act; (7) violation of New Jersey's Consumer Fraud Act; and (8) violation of Arizona's Consumer Fraud Act. *Id.* ¶¶ 176–269.

On April 16, 2024, the Court consolidated the *Sutaniman v. Axos Bank*, No. 3:23-cv-2266-RSH-SBC and *Blosser v. Axos Bank*, Case 3:24-cv-259-RSH-SBC cases into the present action for all purposes. ECF No. 21. On July 11, 2024, the Court denied UFB's first motion to compel arbitration without prejudice. ECF No. 26. On July 25, 2024, UFB filed the instant renewed motion to compel arbitration. ECF No. 27. Plaintiffs filed a response and UFB filed a reply. ECF Nos. 29, 30.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "governs arbitration agreements in 'contract[s] evidencing a transaction involving interstate commerce.'" *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1193 (9th Cir. 2024) (quoting 9 U.S.C. § 2). Pursuant to Section 2 of the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" 9 U.S.C. § 2. This provision reflects "both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted).

The FAA permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "In deciding whether to compel arbitration under the FAA, a court's inquiry is limited to two 'gateway' issues: '(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "If both conditions are met, the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Id.* (internal quotation marks omitted); *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.").

## III. ANALYSIS

### A. Valid Agreement to Arbitrate

The Court first considers whether a valid agreement to arbitrate to exists in this case. "[A] court must resolve any challenge that an agreement to arbitrate was never

formed[.]" *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022). "In determining the validity of an agreement to arbitrate, federal courts should apply ordinary state law principles that govern the formation of contracts," in this case, California law. *Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 782 (9th Cir. 2002) (internal quotation marks omitted); *see* ECF Nos. 27-2 at 64; 29-1 at 15.[1] The party seeking to compel arbitration "has the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014).

Two agreements are relevant to this dispute: (1) the Personal Deposit Account Agreement and Schedule of Fees ("Account Agreement"); and (2) the Online Access Agreement. ECF Nos. 27-1 at 19; 29 at 9. The Parties do not dispute that at the time the lawsuit was filed, the Online Access Agreement contained an arbitration provision, while the Account Agreement did not. ECF No. 27-1 at 19. However, Plaintiffs contend UFB has failed to prove either that: (1) Plaintiffs executed the Online Access Agreement; or (2) Plaintiffs meaningfully assented to the agreement's arbitration provision. ECF No. 29 at 14–19.

### 1. Authenticity of Electronic Signatures

The Court first addresses whether UFB has sufficiently authenticated Plaintiffs' electronic signatures to the Online Access Agreement. California's Uniform Electronic Transactions Act provides that "an electronic signature has the same legal effect as a handwritten signature." *Ruiz v. Moss Bros. Auto Grp., Inc.*, 232 Cal. App. 4th 836, 843 (Ct. App. 2014).[2] "Still, any writing must be authenticated before the writing . . . may be received in evidence." *Id*.  "[California] Civil Code section 1633.9 addresses how a

---

[1]  All citations to electronic case filing ("ECF") entries refer to the ECF-generated page numbers.

[2]  An "electronic signature" is defined as "an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record." Cal. Civ. Code § 1633.2(h).

proponent of an electronic signature may authenticate [a] signature—that is, show the signature is, in fact, the signature of the person the proponent claims it is." *Id*. Under section 1633.9: "An electronic record or electronic signature is attributable to a person if it was the act of the person. The act of the person may be shown in any manner, including a showing of the efficacy of any security procedure applied to determine the person to which the electronic record or electronic signature was attributable." Cal. Civ. Code § 1633.9(a); *see Fabian v. Renovate Am., Inc.*, 42 Cal. App. 5th 1062, 1068 (Ct. App. 2019) ("The party seeking authentication may carry its burden 'in any manner,' including by presenting evidence of the contents of the contract in question and the circumstances surrounding the contract's execution.").

In this case, Plaintiffs Sutaniman, Kuperstein, and Blosser submitted sworn declarations attesting they do not recall accepting the Online Access Agreement prior to opening their savings accounts. Declaration of Gianni Sutaniman (ECF No. 29-3) ¶ 5; Declaration of Samuel Kuperstein (ECF No. 29-2) ¶ 14; Declaration of Mark Blosser (ECF No. 29-4) ¶ 3. The burden, therefore, shifts to UFB "to prove by a preponderance of the evidence that [Plaintiff's electronic] signature is, indeed, authentic." *Bulnes v. Suez WTS Servs. USA, Inc.*, No. 22-cv-1154-BAS-AHG, 2023 U.S. Dist. LEXIS 78472, at *21 (S.D. Cal. May 4, 2023).

To meet its burden, UFB submits the supplemental declaration of Derek Tam, its "First Vice President, Software Development Manager." Supplemental Declaration of Derek Tam ("Suppl. Tam Decl.," ECF No. 27-2 at 1–14) ¶ 1.[3] Mr. Tam declares that

---

[3]   Plaintiffs' evidentiary objections to Mr. Tam's declaration [ECF No. 29-5] are **OVERRULED**. Mr. Tam's declaration properly lays a foundation and establishes his personal knowledge of the facts stated in his declaration. The Court does not find Mr. Tam's statements vague, argumentative, or irrelevant. The Court is also not persuaded the contents of Mr. Tam's declaration could not be presented in an admissible form at trial. *See Lomeli v. Midland Funding, LLC*, No. 19-CV-01141-LHK, 2019 U.S. Dist. LEXIS 166151, at *20 (N.D. Cal. Sep. 26, 2019) ("[O[I]n a motion to compel arbitration . . . the Court does not focus on the admissibility of the evidence's form, so long as the contents

since starting at UFB, he and his team have been responsible "for building, maintaining, and improving the backend software and database systems" UFB uses for: (1) account enrollment (the "Enrollment System"); (2) user verification (the "Identity System"); and (3) online banking services (the "OLB System"). Suppl. Tam Decl. ¶ 3. The three systems are used together to "gather and store information about UFB's accountholders" and "are also the systems applicants and accountholders must use to obtain and use their UFB accounts." *Id.* ¶ 4.

Mr. Tam's supplemental declaration describes the steps a new customer must take in order to: (1) open an account with UFB; and (2) sign up for online banking services. *Id.* ¶¶ 8–21. First, to open an account, a prospective customer must complete the "account opening process on UFB's website" which requires the individual to provide a "first name, last name, email, and mobile phone number" and create a "username and password." *Id.* ¶ 8. "Usernames are unique to each UFB applicant (and, once the account is approved, accountholder)." *Id.* ¶ 11. When an applicant creates a unique username, UFB's Identity System assigns the applicant a unique "UDBId"—the "identifier used by UFB in its backend systems." *Id.* ¶ 12. During the enrollment process, the applicant is also asked to provide other personal identifying information, including occupation, address, birth date, social security number, and Driver's License or State ID number. *Id.* ¶ 13. This data is "paired" with the applicant's unique username and UDBId. *Id.*

To access their account online, an accountholder must return to UFB's website (or mobile application) and login using their unique username and password. *Id.* ¶ 18. When logging in for the first time, the accountholder is presented with a "Terms & Conditions" screen:

are capable of presentation in an admissible form at trial.") (internal quotation marks omitted).



*Id.* ¶ 18. The "Terms & Conditions" screen states at the top: "Please read and accept our Terms & Conditions." *Id.* ¶ 19. Directly below is "a copy of the Online Access Agreement that individuals can scroll through to review." *Id.* Below this is text stating the following:

> By selecting 'Agree & Continue', you consent to adhere to the Terms and Conditions as stated in the Axos Online Access Agreement. This Online Access Agreement governs your use of this site for your personal requests and transactions; and details the online policies relative to Axos Bank, Nationwide, and UFB Direct Online and Axos Invest accounts, products, services and features. Please read this Agreement carefully.

*Id.* The text is followed by an orange button reading "Agree & Continue." *Id.* ¶ 22. According to Mr. Tam, when an accountholder clicks the "Agree & Continue" button, the OLB System "stores the date and time" the button was clicked. *Id.* "UFB knows to

associate that datapoint with the accountholder because the accountholder cannot proceed to the above screen without having logged in with their unique username and password." *Id.* For these reasons, Mr. Tam declares he was able to query UFB's OLB System using Plaintiffs' UBDIds to confirm the date and time each Plaintiff clicked the "Agree and Continue" button. *Id.* ¶¶ 22–25.

The Court determines UFB has submitted sufficient evidence authenticating Plaintiffs' electronic signatures. The California Court of Appeal's decision in *Espejo v. Southern California Permanente Medical Group*, 246 Cal. App. 4th 1047 (2016) is instructive. In that case, defendant submitted a declaration by its systems consultant detailing the company's "security precautions regarding transmission and use of an applicant's unique username and password, as well as the steps an applicant would have to take to place his or her name on the signature line of the employment agreement" and dispute resolution procedure. 246 Cal. App. 4th at 1062. The consultant concluded the electronic signature could only have been placed by someone using plaintiff's "unique user name and password." *Id.* The *Espejo* Court determined these details were satisfactory to "establish" the authenticity of the electronic signature. *Id.* Similarly, here, Mr. Tam's supplemental declaration describes the steps an accountholder must take to open an account with UFB and sign up for UFB's online banking services. Tam. Suppl. Decl. ¶¶ 8–21. Mr. Tam further states Plaintiff could not have accessed UFB's online banking services without first agreeing to the Online Access Agreement and this process could only have been completed by someone using Plaintiff's unique username and password. *Id.* ¶¶ 16–21.[4]

---

[4] In contrast, the Northern District's *Hoang* decision—cited by Plaintiffs—is inapposite. ECF No. 29 at 15–16. In *Hoang*, defendant moved to compel arbitration of plaintiff's claims based on the arbitration provision set forth in a Client Manual. *Tuong Hoang v. Citibank, N.A.*, No. 23-cv-03270-PCP, 2023 U.S. Dist. LEXIS 205803, at *2 (N.D. Cal. Nov. 16, 2023). The question in *Hoang* was not—as it is here—whether defendant had properly authenticated plaintiff's signature. Indeed, in that case, defendant

"[T]he burden of authenticating an electronic signature is not great." *Ruiz*, 232 Cal. App. 4th at 844. UFB has met its burden here. *See Guidry v. Vitas Healthcare Corp.*, No. 3:24-cv-00176-H-MMP, 2024 U.S. Dist. LEXIS 84799, at *8 (S.D. Cal. May 9, 2024) (electronic signature authenticated where defendant provided evidence regarding transmission and use of plaintiff's username and password and steps plaintiff would have taken to execute agreement electronically); *Beltran v. Inter-Con Sec. Sys.*, No. 2:21-cv-04927-VAP-(AFMx), 2021 U.S. Dist. LEXIS 174720, at *12 (C.D. Cal. Sep. 13, 2021) (electronic signature authenticated where defendant described hiring process in detail and clarified process "could be completed only with signer's private password"); *Tanis v. Sw. Airlines, Co.*, No. 18-cv-2333-BAS-BGS, 2019 U.S. Dist. LEXIS 38876, at *14 (S.D. Cal. Mar. 11, 2019) (electronic signature authenticated where evidence showed someone using plaintiff's username and password clicked an acknowledgement of terms box and this action "could only have been done" by plaintiff"); *Garcia v. NRI USA, LLC*, No. 2:17-CV-08355-ODW-GJS, 2018 U.S. Dist. LEXIS 130055, at *6–7 (C.D. Cal. Aug. 1, 2018) (electronic signature authenticated where the "only way" for plaintiff to access and sign arbitration agreement was using a confidential username and password).

### 2. Meaningful Assent

The Court turns next to whether there is sufficient evidence Plaintiffs meaningfully assented to the Online Access Agreement's arbitration provision. Plaintiffs argue the "misleading context" in which the Online Access Agreement was presented precludes a finding of mutual assent and that the California Court of Appeal's decision in *Herzog* "mandate[s] the conclusion that Plaintiffs did not agree to the purported arbitration clause in the clickwrap Online Access Agreement." ECF No. 29 at 17–18. The Court disagrees.

---

conceded plaintiff had not signed the Client Manual. *Id.* at *7. Lacking this signature, the court found defendant had to establish plaintiff had been provided a copy of the manual, and had not met its burden of proof by relying on its "customs and practices." *Id.* at *12–14. The *Hoang* case has no bearing on the question of when an electronic signature has been properly authenticated.

In *Herzog v. Superior Court*, 101 Cal. App. 5th 1280, 1285 (2024), defendant Dexcom moved to compel arbitration on the basis of a "clickwrap agreement" presented to the plaintiffs upon installing a mobile medical application on their personal smart devices. Once plaintiffs had successfully created or logged into their Dexcom accounts, they would advance to a screen titled "Legal" with the following interface:

> [T]he following paragraph of text is displayed: "You understand and agree that your use of this website or any DexCom Inc. mobile application or software platform for your DexCom continuous glucose monitor is subject to the Terms of Use, Privacy Policy and any other acknowledgements listed below. *By ticking the boxes below you understand that your personal information, including your sensitive health information, will be collected, used and shared consistently with the Privacy Policy and Terms of Use*. You further understand that personal information and sensitive personal information will be stored and processed by DexCom, Inc., and/or its affiliate, SweetSpot Diabetes Care, Inc. in the United States, which may have different data protection laws than the country in which you reside."
>
> Underneath this paragraph were two boxes: one next to the statement, "I agree to Terms of Use" and another next to, "I agree to Privacy Policy." The phrases "Terms of Use" and "Privacy Policy," which were written in green, were hyperlinks that, if clicked, would take the user to separate webpages. The user has to click on the boxes in order to place a check mark in them, which would then allow the user to click on the green "Submit" button that appeared below the boxes. The user, however, is not required to actually view the hyperlinked Terms of Use (or the Privacy Policy) in order to complete the setup wizard process to use the G6 App.

*Id.* at 1289–90 (emphasis in original). The *Herzog* Court held users "would have no reason to believe, given the context of the transaction and the content of the text on the 'Legal' screen, that by clicking the checkbox next to 'I agree to Terms of Use' they were entering an agreement that concerned any matters other than the scope of the user's privacy waiver and management of the user's personal information." *Id.* at 1298.

The interface at issue in *Herzog*, however, differs from the one at issue here. In *Herzog*, the Terms of Use containing the arbitration provision was in a separate,

hyperlinked page. *Id.* at 1290. In the context of such a "clickwrap" agreement, the *Herzog* Court reasoned that "the content of the screen on which a clickwrap is presented can undermine the inference the consumer had notice of the terms to which they were assenting when they clicked the associated checkbox." *Id.* at 1296–97. In contrast, UFB's Online Access Agreement is more similar to a "scrollwrap" agreement. "Scrollwrap agreements go one step further [than clickwrap agreements] and place the contractual terms directly in front of the user, requiring them to scroll through the terms before checking a box or clicking a button to indicate their assent[.]" *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 470 (Ct. App. 2021). According to Mr. Tam, Plaintiffs were presented with a scrollable copy of the Online Access Agreement in its entirety and cautioned that by clicking the "Agree & Continue" button, they consented "to adhere to the Terms and Conditions as stated in the Axos Online Access Agreement." Suppl. Tam. Decl. ¶¶ 18–19.

The Court determines this agreement was sufficient to place Plaintiffs on notice of the Online Access Agreement's terms. *Sellers*, 73 Cal. App. 5th at 470 ("[T]here should be little doubt scrollwrap agreements are enforceable under California law because the consumer is *given the contract*, a sufficient circumstance to place the consumer on inquiry notice of the contractual terms.") (emphasis added); *see Flores v. Coinbase, Inc.*, No. CV 22-8274-MWF (KS), 2023 U.S. Dist. LEXIS 90926, at *8–9 (C.D. Cal. Apr. 6, 2023) (holding plaintiff "affirmatively manifested" assent where full text of agreement was made available in a "scroll-box"); *Veribi, Ltd. Liab. Co. v. Compass Mining, Inc.*, No. 2:22-cv-04537-MEMF-JPR, 2023 U.S. Dist. LEXIS 12333, at *25 (C.D. Cal. Jan. 20, 2023) (holding scrollwrap agreement provided "sufficient notice" of arbitration terms because the terms were presented "directly" to plaintiff); *Perez v. Bath & Body Works, LLC*, No. 21-cv-05606-BLF, 2022 U.S. Dist. LEXIS 116039, at *10 (N.D. Cal. June 30, 2022) ("[S]crollwrap agreements are enforceable, as they affirmatively show the terms to the user before obtaining assent rather than linking to a separate page containing the terms that does not need to be viewed prior to agreement (as clickwrap

agreements do.").

## B. Scope and Enforceability

The Court turns next to whether the Online Access Agreement's delegation clause sends threshold questions of arbitrability to the arbitrator.

The FAA "allows parties to agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions[.]" *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). However, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so[.]" *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 649 (1986)). "Such 'clear and unmistakable evidence of [an] agreement to arbitrate arbitrability might include a course of conduct demonstrating assent or an express agreement to do so'—*i.e.*, a delegation clause." *Lim*, 8 F.4th at 1000 (quoting *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011)).

Here, the Online Access Agreement contains a delegation clause that states:

> You and we agree that any Covered Disputes between or among you and us, regardless of when it arose, will, upon demand by either you or us, be resolved by the arbitration process described in the Binding Arbitration and Waiver of Class Action Rights section below. You understand and agree that you and we are each waiving the right to a jury trial or a trial before a judge in a public court.

ECF No. 27-2 at 58. The provision also defines a "dispute" to include "[w]hether a disagreement is a 'dispute' subject to binding arbitration as provided for in this Arbitration Provision." *Id.* Finally, the provision provides that the Parties agree "[t]he Arbitrator will decide any dispute regarding the enforceability of this Arbitration Provision." *Id.* at 59.

Plaintiffs argue the Supreme Court's recent decision in *Coinbase* "mandates" that the Court—and not an arbitrator—decide threshold questions of arbitrability. ECF No. 29 at 14. The Court does not read *Coinbase* so broadly. In *Coinbase*, the parties executed

two contracts: the first containing an arbitration provision with a delegation clause, and the second containing a forum selection clause providing that all disputes related to that contract be decided in California courts. *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1190–91 (2024). Defendant argued the first contract's delegation clause "established the terms by which all subsequent disputes were to be resolved[.]" *Id.* at 1191. Plaintiffs maintained—and the Ninth Circuit held—that "the second contract's forum selection clause superseded that prior agreement." *Id.* The Supreme Court "granted certiorari to answer the question of who—a judge or an arbitrator—should decide whether a subsequent contract supersedes an earlier arbitration agreement that contains a delegation clause." *Id.* at 1192. In answering this question, the *Coinbase* Court held "a court, not an arbitrator, must decide whether the parties' first agreement was superseded by their second." *Id.* at 1195.

    The *Coinbase* decision is a narrow one. It holds only that where "parties have agreed to *two* contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." *Id.* at 1194. As UFB notes, the instant case is not one where the Parties entered into two agreements with conflicting forum selection clauses. Instead, it is undisputed the Account Agreement did not have a forum selection or arbitration provision. The Court is, therefore, not being asked to choose between two conflicting agreements.

    Further, even if the Court were being asked to choose between the Account Agreement's lack of a delegation clause and the Online Access Agreement's inclusion of one, the Supreme Court's *Coinbase* decision did not disturb the Ninth Circuit's reasoning below. *Id.* at 1194 ("We decline to consider auxiliary questions about whether the Ninth Circuit properly applied state law."). In its decision below, the Ninth Circuit applied the "general rule" that "when parties enter into a second contract dealing with the same subject matter as their first contract without stating whether the second contract operates to discharge or substitute for the first contract, the two contracts must be interpreted

together and the *latter contract prevails* to the extent they are inconsistent." *Suski v. Coinbase, Inc.*, 55 F.4th 1227, 1230 (9th Cir. 2022). Even if the Account Agreement and Online Access Agreement conflicted, the Online Access Agreement is the *latter* contract in this case. According to Mr. Tam, accountholders agree to the Account Agreement *during* the enrollment process. Suppl. Tam Decl. ¶ 14. Accountholders then *subsequently* agree to the Online Access Agreement when signing up for online banking. *Id.* ¶¶ 19–20. Plaintiffs have not explained why the Ninth Circuit's reasoning would not apply so that the subsequent Online Access Agreement's delegation provision would prevail.

For the above reasons, the Court determines the Online Access Agreement's delegation provision governs and threshold issues of arbitrability are properly reserved for the arbitrator. *See Henry Schein,* 586 U.S. at 68 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue.").

### C. Post-Contractual Conduct

Finally, the Court briefly addresses Plaintiffs' argument that UFB's post-contractual conduct "compels denial" of UFB's motion to compel. ECF No. 29 at 22–23. Plaintiffs argue UFB sent an e-mail on January 26, 2024 notifying its customers that it was adding an arbitration provision to the Account Agreement. *Id.* Plaintiffs contend UFB, therefore, "admitted to its customers" that there was "no arbitration provision governing disputes arising under the Account Agreement." *Id.* This argument is directed to the threshold question of whether Plaintiffs' dispute is covered by the Online Access Agreement's arbitration provision. As the Court already noted above, however, this threshold question is properly reserved for the arbitrator.

### IV. CONCLUSION

For the above reasons, the Court grants in part and denies in part UFB's motion as follows:

1. The Court **GRANTS** UFB's motion to compel arbitration. The Court **ORDERS** the Parties to proceed to arbitration for a determination of arbitrability and

possible arbitration of Plaintiff's individual claims, in the manner provided for in the Online Access Agreement.

    2.    The case is **STAYED** pending the completion of arbitration proceedings pursuant to 9 U.S.C. § 3.

    3.    The Parties are **ORDERED** to file a status update on their arbitration proceedings every **ninety days** and within **seven days** of completion.

    4.    The Court **DENIES** UFB's motion to dismiss as moot.

**IT IS SO ORDERED.**

Dated: September 13, 2024

*Robert S. Huie*
_____
Hon. Robert S. Huie
United States District Judge